**In re DRW PROPERTY CO. 82
d/b/a Apache Arms**

**(The Single Original Hereof Shall be Deemed Filed Under Each Partnership Debtor and in Each Case Listed in the Caption of the Order Procedurally Consolidating Cases for Certain Administrative Purposes Entered on March 29, 1985 and as Supplemented on April 10, 1985), Oaks II of Jacksonville, Ltd. d/b/a Oaks II, Oaks III of Jacksonville, Ltd. d/b/a Oaks III, River Run Associates, Ltd. d/b/a River Run, Debtor.**

**Bankruptcy Nos. 485–40743, 485–40744 and 485–40742.**

United States Bankruptcy Court, N.D. Texas, Fort Worth Division.

Jan. 24, 1986.

**506**

Philip Pierce, Booth, Marcus & Pierce, New York City, Arthur Ungerman, Ungerman & Vickers, Dallas, Tex., for Official Investors Committee.

William L. Norton, Jr., George M. Geeslin, Norton, Pennington, Goetz & Cronkright, Atlanta, Ga., for Certain Investors/Limited Partners in Treehouse of Orlando, Ltd.

Robin Phelan, Haynes & Boone, Dallas, Tex., for debtor Partnerships.

Steve McCartin, Gardere & Wynne, Dallas, Tex., for Donald R. Walker.

George McElreath, Dallas, Tex., for U.S. Trustee.

## ORDER GRANTING DEBTORS' MOTION TO CLASSIFY CLAIMS

MICHAEL A. McCONNELL, Bankruptcy Judge.

The above-referenced Debtor Partnerships and the Official Investors Committee jointly bring this motion before the Court seeking approval of the classification of all investors in the Debtor Partnerships into one class for voting purposes. The motion is brought under Rule 3013 of the Bankruptcy Rules which authorizes court approval of voter classification prior to the solicitation of voter acceptances for confirmation of a proposed plan of reorganization. An evidentiary hearing was held on the motion on December 16, 1985, and the Court orally announced its ruling on the motion in open court on January 15, 1986. The purpose of this Memorandum of Decision is to supplement the Court's oral ruling and to set forth the Court's findings of fact and conclusions of law pursuant to Rules 9014 and 7052 of the Bankruptcy Rules.

### FINDINGS OF FACT

1. There are approximately 5,500 investors in the various "DRW" partnerships. All of the investors invested monies in either the 89 Debtor Partnerships or the 114 Non-Debtor Partnerships for the purpose of acquiring an investment interest in the properties owned by the Debtor Partnerships.[1]

2. Donald R. Walker ("Walker") controlled all of the Debtor and Non-Debtor Partnerships. Walker additionally controlled the corporation which syndicated and operated the partnerships, and he controlled the corporation which managed the partnerships' assets. Walker is the individual general partner for all of the Debtor and Non-Debtor Partnerships. In his role as general partner, Walker managed the business of the Debtor and Non-Debtor

---

1. The eighty-nine Debtor partnerships and the one hundred fourteen Non-Debtor partnerships are enumerated in Debtor's Exhibits 1 and 2 admitted into evidence at the classification hearing.

Partnerships. In addition, almost all of the Debtor and Non-Debtor Partnerships have one corporate general partner consisting of a corporation wholly owned and controlled by Walker. That corporate entity was most often DRW Interests, Inc., a corporation wholly owned by Walker.

3. Each Debtor Partnership owns or owned a single asset (the "Property"), consisting of either an apartment project, an office building, or a note given in consideration for the sale of such property. The Properties are located in seven states: Texas, Louisiana, Tennessee, North Carolina, South Carolina, Florida and Georgia.

4. The entity responsible for syndicating and raising all of the investor funds in connection with the Debtor and Non-Debtor Partnerships was DRW Investments, Ltd. ("DRW Investments"), a corporation wholly owned and controlled by Walker, with its office in Dallas, Texas. DRW Investments additionally operated the business functions of the Debtor and Non-Debtor Partnerships, issuing operating statements and handling dealings with the lienholders. As president and chief executive officer of DRW Investments, Walker was responsible for the business decisions of the company. Walker also oversaw all paperwork, acquisitions and sales, and generated all reports issued by the corporation.

5. The entity responsible for managing all of the assets owned by the Debtor and Non-Debtor Partnerships was DRW Realty Services, Inc. ("DRW Realty"), a corporation wholly owned and controlled by Walker, with its office in Dallas, Texas. As president and chief executive officer of DRW Realty, Walker controlled the business of DRW Realty, making all of the company's business decisions and overseeing all paperwork of the company.

6. In addition to being controlled by the same president and chief executive officer—Donald R. Walker—DRW Investments and DRW Realty also shared employees and signatures on checks.

7. Because the monies raised from the investing limited partners were comingled, it is impossible to attribute ownership interests in specific properties to investors on an individual basis. The books and records reviewed by Arthur Young[2] reveal that, from 1981 to the date of the filing of the Walker bankruptcies on March 25, 1985, the capital contributions of the investing limited partners (totalling approximately $164 million) were handled in one of the following ways.

8. The investors funds flowed first to a partnership account and then to a DRW Investments "concentrated cash account" (i.e. an account holding comingled funds from all investors) or a Walker personal account. Alternatively, the funds may have flowed directly from the investors to either the DRW Investments concentrated cash account or a Walker personal account.

9. The funds in the DRW Investment concentrated cash account or the Walker personal account were in turn distributed in one of the following ways: (i) to acquire new properties for the Debtor Partnerships, (ii) to a concentrated cash account held by DRW Realty (which account included comingled funds generated by all of the Properties held by the Debtor Partnerships and which account was used to operate the

**2.** The international accounting firm of Arthur Young was retained in January of 1985 to trace the application of certain investors' investments in specified Walker partnerships. After the filing of the above-captioned bankruptcy cases, Arthur Young was retained by the Investors' Committee (and was subsequently appointed by this Court) to perform the same task with respect to all investments made by the limited partners in the Debtor and Non-Debtor Partnerships.

Thirty-six (36) Arthur Young accountants have worked on that firm's engagement in the Walker cases. Those individuals have expended approximately five thousand (5,000) hours in (i) reviewing Walker's personal books and records, as well as the books and records of all entities owned by Walker, the Debtors, and the Non-Debtor Partnerships and (ii) preparing analyses with respect to the data contained therein. Don Collum supervised the work done by Arthur Young for 12 years, and he has been a partner for 3 years. He has special expertise in the area of bankruptcy.

Properties), or (iii) to other Walker interests.

10. Arthur Young concluded that, despite the existence of numerous records, it is virtually impossible to trace the flow of any particular investor's funds to either a particular project (for acquisition or operation) or to another Walker entity. In the few instances where such tracing has occurred, the records reflect that, notwithstanding contrary representations made to the investors, funds raised for a designated property were used to acquire different properties. The example cited by Don Collum was Treehouse, which was a "specified" "single-tier" offering.[3] The funds raised for Treehouse were used to acquire other projects (Westchester, Oaks II and Oaks III), and *none* of those funds were used to acquire Treehouse.

11. The other examples cited by Mr. Collum at the hearing held on December 16, 1985, include the following:

(a) Based upon the representation that they were investing in *Arbor Square* project, investors invested $1.324 million, which funds were deposited at *Union Bank*. Prior to a transfer of these funds to any other bank, a $400,000 payment coming from *Preston State Bank* was made for the purchase of the Arbor Square project.

(b) Based upon the representation that they were investing in *Bridgegate* project, investors invested $1,407,000, and those funds were deposited at *Union Bank* and *M-Bank*. After a small transfer from M-Bank to Preston State Bank in the amount of $210,000, a payment for acquisition of the Bridgegate project was made from the *Preston State Bank* account in the amount of $551,899.

(c) Based upon the representation that they were investing in *Cambridge, Texas*

project, investors invested $629,000, which funds were deposited at *Union Bank*. Prior to a transfer of these funds to any other bank, a $418,939 payment coming from *Preston State Bank* was made for the purchase of the *Cambridge, Texas* project.

(d) With respect to *Barcelona West* project, $750,000 was raised and deposited in a National Bank of Commerce account, but the distribution for the subsequent payment totalled $772,055.

(e) With respect to the *Depot* project, $1.2 million was raised and deposited in a Northpark bank account, but the distribution for the subsequent payment came from Union Bank and totaled $2.7 million.

12. Thus, irrespective of what investors were told would be done with their monies (i.e., irrespective of whether the investment being offered was "specified" or "unspecified"), the invested funds were comingled, used for a number of unrelated purposes, and in any event, are not traceable to a designated property.

13. The only way in which to further analyze the flow of investor funds is to examine the more than two hundred (200) bank accounts on a day-to-day basis over a four (4) year period. That effort would require well over six (6) months and the cost is estimated to exceed two million dollars ($2,000,000.00). In any event, even if that effort were undertaken, according to the testimony of Don Collum inter-partnership debts could never be determined.

14. The funds generated by the Debtors' Properties were also comingled.

15. Although the funds generated by the properties were initially deposited in local bank accounts, they were ultimately comingled in a concentrated cash account held by DRW Realty. The comingled account was used to pay the operational costs

**3.** DRW Investments offered investors two types of investments. The first type, called "Specified Offerings," purported to provide investors an opportunity to invest in only predetermined specified properties. Debtors' Exhibit 7 is an example of a specified offering memorandum. DRW Investments also offered investors investments in *un* determined, *un* specified real estate

properties ("Unspecified Offerings"), granting to the general partner total discretion in choosing the property or properties in which the partnership would ultimately invest. Debtors, Exhibit 6 and Goldome Exhibits 24 and 25 are examples of an unspecified offering memorandum. Debtors, Exhibit 8 summarizes which offerings were "Specified" and which were "Unspecified."

of all of the Debtors' Properties, irrespective of the source of the funds.

16. Because funds were constantly shuffled between the partnerships in the form of comingled funds, it is now impossible to determine interpartnership debts.

17. The DRW Realty concentrated cash account was from time to time supplemented by the concentrated cash account of DRW Investments. For example, in 1984, approximately $8 million was transferred from the DRW Investment concentrated cash account to the DRW Realty concentrated cash account.

18. At the project level, the expenses of a particular project and the proceeds generated by a particular project can be determined. Nevertheless, because of the comingling, inter-partnership accounts cannot be determined.

19. Neither Walker nor his corporate entities ever prepared formal assignments providing for an assignment of a limited partner's investment to a particular property. Because of the absence of written assignments of investment partnership interests, ownership interests in the properties cannot be allocated to the partners in the investment partnerships.

20. In almost all instances, Limited Partnership Agreements were not amended to include a list of limited partners. As a result, most of the partnership agreements list Don Walker, Trustee, as the sole limited partner.

21. The sole document given to Arthur Young by Donald Walker to reflect the purported assignment of partnership interests was introduced into evidence as Debtors' Exhibit 10. The purported assignments shown on the exhibit on a given project at times exceed 100%, and the exhibit's calculations do not comport with the contributions actually obtained.

22. Arthur Young prepared Debtors' Exhibits 11 and 12 to illustrate why the numbers set forth in Debtors' Exhibit 10 (which was prepared by a Walker employee) do not work. Debtors' Exhibit 11 assumes the propriety of the assignments contained in Exhibit 10 for the Charlotte Woods project. Applying that assumption, Exhibit 11 demonstrates that the fund which would then be theoretically available for Tirolean Village, Country Manor and Baytonian fall dramatically short.

23. Debtors' Exhibit 12 reflects that the purported percentage allocations also do not work for the "specified" partnerships. This exhibit details the extreme variances of the capital attributed per percentage point of "assigned interests" in "specified properties." Thus, in connection with the Brookshire project, one partnership would have allegedly paid $20,070 per percentage point while another partnership would have purportedly paid $48,467 per percentage point.

24. Don Collum further illustrated the problems with the alleged assignment sheet by way of the following example. Collum testified that three groups of partners may have each been allotted a 30% interest in a given partnership while the first group paid $1,000,000 the second group paid $500,000 and the third group paid $300,000. Under that scenario, if the project were sold for $3 million (with each group receiving $1 million), then the first group would only get back its initial investment, the second group would receive a 2 for 1 return, and the third group would receive a 3 for 1 return. This result is, of course, wholly inequitable and not legally or factually supportable.

25. Debtors' Exhibit 3 reflects the purported assignments of Non-Debtor partnerships to Debtor partnerships. As reflected by Exhibit 3, many Non-Debtor partnerships were purportedly assigned interests in more than one property. Thus, certain properties (or Debtor Partnerships) have purportedly overlapping limited partners.

26. Thirteen of the Debtor Partnerships (identified by asterick on Debtors' Exhibit 1) are "single-tier" partnerships, meaning that only a single limited partnership was "assigned" to the referenced project. In these instances, the percentage ownership interest of a given limited partner in the project can be theoretically determined;

**510**

however, because of the comingling of funds (for example, the Treehouse project), these investors' funds can still not be traced to the referenced projects.

27. Because of the inability to trace the contributions of the limited partners and, further, because of the inability to allocate ownership interests in the properties to the partners of the investment partnerships, Arthur Young has concluded that the only objectively supportable way to allocate investors' interests is to (i) divide the particular investor's contribution by the total amount of all investor contributions and (ii) apply that partner's percentage to a pool including all of the Debtors' assets.

28. In addition to comingling funds, Walker, in running the businesses of the Debtors and the Non-Debtor Partnerships (from 1981 to March 25, 1985), flagrantly ignored the provisions of the partnership agreements. The partnership agreements required that the general partner refrain from selling the property unless and until the limited partners were polled and approved such sale. Notwithstanding such provisions, Walker unilaterally sold at least four projects without notice to or approval of the limited partners. The partnership agreements further required that tax returns be prepared. Notwithstanding such provisions, no partnership tax returns were prepared for 1983 or 1984. Only some returns were prepared for 1982. In some instances, K–1's were distributed to limited partners without underlying partnership tax returns; in those cases, the K–1's are meaningless. The preparer of the returns which were filed was Walker.

29. The partnership agreements required that operating reports be issued quarterly reflecting the operations (and, specifically, the net cash flow) of the limited partnerships. Notwithstanding such provisions, no partnership operating reports were issued and no capital accounts were prepared for the partners. Walker instead sent operating information only on the project level.

30. Insofar as the foregoing findings of fact constitute conclusions of law, they shall be incorporated hereinbelow. Insofar as the following conclusions of law may be deemed to be findings of fact, they are incorporated herein.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and subject matter of this motion pursuant to 28 U.S.C. § 157. The instant motion to classify claims is a "core proceeding" as defined by 28 U.S.C. § 157(b)(2)(C).

2. Section 1122 of the Code sets forth the standards for proper classification of claims and interests and provides:

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is *substantially similar* to the other claims or interests of such class. (emphasis added).

3. In *In re Los Angeles Land and Investments, Ltd*, 282 F.Supp. 448 (D.Hawaii 1968), *aff'd*, 447 F.2d 1366 (9th Cir.1971) the court analyzed the issue of classification of claims in a plan of reorganization and stated:

"The test to be applied appears to be one directed toward a determination of the "nature" of the claim. This would encompass an analysis of the legal character or the quality of the claim as it relates to the assets of the debtor."

*Id.* at 453. *See also, In re Fantastic Homes Enterprises, Inc.*, 44 B.R. 999, 1000 (M.D.Fla.1984).

4. In the case of *In re Huckabee Auto Co.*, 33 B.R. 141 (Bankr.M.D.Ga.1981), the court underscored the fundamental importance of proper classification of claims and interests under a plan or reorganization:

It is necessary that the parties in interest be protected within the statutory provisions of the Code, and to insure this, Chapter 11 of the Bankruptcy Code is based on a system that allows properly notified parties to negotiate, participate and protect their own interests throughout the development and implementation of the plan of reorganization. One of the basic rights of creditors which affords

them protection, is their right to vote either to accept or reject the plan of reorganization.... *This system works only if the standards set by the Code on classification, treatment, and voting are followed precisely, not only in form, but in spirit.* To allow otherwise would enable debtors to engineer plans to unfairly affect the rights of creditors. (emphasis added)

*Id.* at 147; *see also, In re Planes, Inc.,* 48 B.R. 698 (Bankr.N.D.Ga.1985); *In re Mastercraft Record Plating, Inc.,* 32 B.R. 106 Bankr.S.D.N.Y.1983); *In re Butler,* 42 B.R. 777 (Bankr.E.D.Ark.1984).

5. Section 1122 of the Bankruptcy Code states that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. As the Court stated in *In re Martins Point Limited Partnership,* 12 B.R. 721, 8 BCD 40 (Bankr.N.D.Ga.1981) "the Code provides that in order for creditors to be classified together, their interests need be only substantially similar and not identical." In the case before this Court, there is no significant distinction between investors and the Court finds that all investors may be properly treated in the same class.

6. Rule 3013 of the Bankruptcy Rules provides that "For the purposes of the plan and its acceptance, the court, may, on motion after hearing on notice as the court may direct, determine classes of creditors and equity security holders pursuant to §§ 1122 and 1322(b)(1) of the Code."

7. The Advisory Committee Note to Rule 3013 explains the intended purpose of the rule:

Sections 1122 and 1322(b)(1) set the standards for classifying claims and interests but provide that such classification is accomplished in the plan. This rule does not change the standards; rather it recognizes that it may be desirable or necessary to establish proper classification before a plan can be formulated. It provides for a court hearing on such notice as the court may direct.

8. Each investor gave to Donald Walker a sum of money with two expectations or objectives. First, the money was to be invested in one or more real estate projects. However, for investments made after 1981 the selection of projects attributable to each investor was normally totally arbitrary (the so called "two-tier projects") since the actual investment was generally made in investment partnerships which were to have invested in operating partnerships holding real estate. Even during 1981 intended investments in a so called "single-tier partnership" which held record title to real estate never really happened. As Mr. Collum testified for example, approximately thirty-five (35) investors gave money to Donald Walker to purchase the Treehouse project. In fact, the funds of the investors were utilized in the purchase of the Westchester project, the Oaks II project and the Oaks III project. Funds of other presently unknown investors were actually used to purchase Treehouse. As the testimony of Mr. Collum demonstrated, the first objective of the investors, to purchase an interest in a specific piece of real estate, was never accomplished.

9. The second objective or expectation of the investors was to receive certain tax benefits from a specific project or projects. Mr. Collum testified that the K1's received by the investors were fictitious in his opinion and bore no relationship whatsoever to the project or projects in which an individual investor attempted to purchase an interest.

10. As a result of the massive fraud and comingling of funds by Donald Walker, it is impossible to determine who owns even the "single tier" projects. It is even more difficult to determine who owns a project such as Oaks III which was a blind pool "two-tier" project.

11. Each of these investors have substantially similar rights to vote in any of the eighty-nine Debtor Partnership cases. It would unfairly discriminate against investors to allow different classifications based merely upon Donald Walker's whim-

sical allocations which are not objectively supportable. To classify an investor as the holder of a voting claim or interest based solely upon an arbitrary determination by Donald Walker or to classify an investor as the holder of a voting claim or interest in the Treehouse case based solely upon what Donald Walker promised, but did not accomplish, would unfairly discriminate and validate the fraud perpetrated by Walker.

12. Likewise, money that was siphoned from the operations of various Debtors creates potential interests in the recipient projects. Each investor has similar rights to those operational funds which were arbitrarily utilized for the benefit of all of the partnerships. For example, Mr. Collum testified that one and one-half million dollars invested in the Depot project came from parties who were not arbitrarily allocated an interest in Depot by Donald Walker.

13. Although the possibility of classifying the investors into separate classes based upon their original solicitation to be included in a "single tier", "two-tier", "specified" or "unspecified" investment has occurred to the Court, such distinctions have no basis in fact. For example, funds advanced by the investors in the Treehouse (a single-tier, specified property) project were actually used in the purchase of three unrelated properties. Accordingly, the classification proposed by the Investors' Committee and the Debtors appears to be the only fair and equitable classification scheme.

14. All parties are cautioned that this Order should not be construed as a ruling on the ultimate confirmation issues set forth in Section 1129(a) and (b) of the Bankruptcy Code. The Court simply finds as a matter of fact and law that the plan proponents have properly classified claims and interests pursuant to Section 1122 of the Code.

Based upon the foregoing, IT IS ORDERED that the Joint Motion to Classify Claims be and hereby is Granted.